Filed 8/9/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| JASON CROSS et al.,<br><br>     Plaintiffs and Appellants,<br><br>v.<br><br>FACEBOOK, INC.,<br><br>     Defendant and Appellant. | A148623, A149140<br><br>(San Mateo County<br>Super. Ct. No. CIV537384) |

We here address appeals filed by both sides from an order on an anti-SLAPP motion, which order granted the motion as to three causes of action and denied it as to three others.

Plaintiffs are Jason Cross, also known as Mikel Knight, a country rap artist, and two entities affiliated with him. Defendant is Facebook, Inc. (Facebook). The dispute arises out of a Facebook page called "Families Against Mikel Knight," which page, plaintiffs claimed, incited violence and generated death threats against Knight and his team. Plaintiffs sought to have the page removed, Facebook refused, and plaintiffs sued, in a complaint that alleged six causes of action. Facebook filed a special motion to dismiss all six causes of action, arguing that they arose from protected activity and that plaintiffs could not show a probability of prevailing on any of them. The trial court held that the complaint was based on protected activity, that plaintiffs could not prevail on the first three causes of action, and granted the anti-SLAPP motion as to them. The trial court denied the motion as to the three other causes of action—claims alleging statutory and common law claims for violation of Knight's right of publicity, along with a derivative unfair competition law (UCL) claim—concluding that Knight had shown a probability of prevailing on them.

1

Both sides appeal, plaintiffs arguing that all six causes of action should proceed, Facebook that none should. We agree with Facebook, and thus affirm in part and reverse in part, with instructions to the trial court to enter an order granting the anti-SLAPP motion and striking the complaint.

## BACKGROUND

### The Facts

Plaintiff Jason Cross, also known as Mikel Knight (Knight), is, as described in his complaint, "an American recording artist in the genre of Country Rap/Urban Country. Knight's music is available on streaming music services such as Spotify, and his music videos are available on music video services such as Vevo." 1203 Entertainment, LLC (1203 Entertainment) is Knight's record label, which itself has a marketing subsidiary, MDRST Marketing/Promotions (MDRST) (when referred to collectively, Knight, 1203 Entertainment, and MDRST will be referred to as plaintiffs).

Facebook operates a social networking service that enables some two billion users worldwide to connect and share information that is important to them with family, coworkers, and friends. Use of the service is free, but users agree to Facebook's terms of service when they sign up for a Facebook account and each time they access or use Facebook.

Knight's Facebook experience apparently proceeded uneventfully for several years, until 2014, when two accidents happened within a week.

MDRST's marketing efforts included hiring of independent contractors who would travel throughout the country in vans that featured Knight's name and logo, promoting his music and merchandise. On June 9 and 16, 2014, two vans were involved in separate accidents when the drivers fell asleep at the wheel. The accidents had tragic consequences, including two deaths and one serious injury.

Shortly after the accidents, a publicly available Facebook page called "Families Against Mikel Knight" was created, apparently by a person (or persons) related to the victims. As to plaintiffs' version of what followed, their brief describes it this way: "numerous commenters began posting statements inciting violence and death threats

2

against Knight and members of his record labels . . . . Because of these comments, numerous members of Mr. Knight's promotion team were verbally threatened and physically assaulted. [¶] In addition to these threats and assaults, the unauthorized Facebook page also severely impacted Knight and 1203 Entertainment's business deals. In 2014 and 2015, Knight was in negotiations with numerous companies to sign lucrative deals involving his music. But once representatives from these companies, which included Nielsen SoundScan and the Dallas Cowboys football team, reviewed the content of the unauthorized Facebook pages, they backed out of these negotiations."

Sometime in late 2014, Knight informed Facebook of the comments and threats. And on June 5, 2015, Knight's attorney sent a letter to Facebook demanding that it remove the pages. Facebook refused. This lawsuit followed.

**The Proceedings Below**

On February 16, 2016, plaintiffs filed a verified complaint against Facebook. It alleged six causes of action, styled as follows: (1) breach of written contract; (2) negligent misrepresentation; (3) negligent interference with prospective economic relations; (4) breach of Civil Code section 3344; (5) violation of common law right of publicity; and (6) unlawful and unfair business practices, Business and Professions Code section 17200 (the UCL claim). Knight was a plaintiff in all six causes of action; 1203 Entertainment was also a plaintiff in the third cause of action; and the sixth cause of action was apparently by all three plaintiffs.[1]

The essence of the complaint was that Facebook delayed in disabling the "Families Against Mikel Knight" page, and failed to detect and quickly remove two other claimed "unauthorized" pages critical of Knight. This, plaintiffs claimed, violated Facebook's terms and community standards and Knight's right of publicity.[2]

---

[1] The complaint says the cause of action is "by Both Plaintiffs," but as noted there are three.

[2] This was at least the second attempt by plaintiffs to sue Facebook. In July 2015, Knight and 1203 Entertainment sued Facebook in Tennessee state court and obtained an ex parte temporary restraining order against Facebook. Facebook's motion to dissolve

3

On March 30, Facebook filed a demurrer, and a special motion to strike (anti-SLAPP motion). The anti-SLAPP motion contended that the complaint arose from the exercise of the constitutional right of free speech in connection with an issue of public interest, and that plaintiffs could not show a probability of success for two reasons: (1) the claims were barred by the Communications Decency Act; and (2) even if not, the claims were not viable under California law.

Plaintiffs filed an opposition that included a memorandum of points and authorities and three declarations—of Knight; Thomas Hairston, senior vice president of 1203 Entertainment; and attorney Mark Punzalan, purporting to authenticate some 60 pages of discovery and correspondence. Plaintiffs also filed a request for judicial notice.

Facebook filed a reply, and the motion came on for hearing on May 12. The trial court heard extensive argument, at the conclusion of which it took the matter under submission.

On May 31, the trial court filed its order, a comprehensive, six single-spaced pages. The court first held that the first step of the anti-SLAPP analysis was satisfied, that "i[t] cannot be disputed that Facebook's website and the Facebook pages at issue are 'public forums,' " and "the content of the subject Facebook pages concern public issues or issues of public interest." The court observed that the lawsuit "clearly targets Facebook's ability to maintain a forum for discussion of these issues, including its discretion to remove content that Plaintiffs find objectionable," and concluded that Facebook "met its initial burden of demonstrating that Plaintiffs' claims arise out of protected activity."

As to step two, the court held that the first three claims were barred by the CDA, going on to explain that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information

the order was granted, the Tennessee court holding that Facebook was not the creator of the content and that the Communications Decency Act (47 U.S.C. § 230)(CDA) barred the claims.

content provider." (47 U.S.C. § 230(c)(1).) The court noted it was undisputed that Facebook is an " 'interactive computer service,' " and that the pages to which plaintiffs objected contained content provided by another "information content provider." So, the trial court concluded, the first three causes of action—for breach of contract, negligent misrepresentation, and negligent interference with prospective economic relations—were barred because these causes of action "treat[ed] Facebook as the 'publisher' . . . of the . . . content" to which plaintiffs object. The court thus granted the anti-SLAPP motion as to those three claims.

The trial court went on to hold, however, that the three other claims—the common law and statutory right of publicity claims and the derivative UCL claim—were not barred by the CDA. In support of this holding, the court relied on 47 U.S.C. § 230(e)(2), which states that "[n]othing in this section shall be construed to limit or expand any law pertaining to intellectual property." In the court's view, "the right of publicity protects a form of intellectual property," and therefore the CDA does not apply to such claims. The court further held that Knight had shown a probability of prevailing on his right of publicity claims because he alleged that Facebook ran advertisements adjacent to the "unauthorized" pages created by the third parties critiquing Knight and his business practices. Even though the advertising run by Facebook adjacent to these pages was entirely unrelated to, and did not use, Knight's name or image, the trial court held that the mere fact that Facebook allowed ads to be displayed adjacent to the pages was sufficient to state a right of publicity claim against it.

On June 16, Facebook filed a notice of appeal. On August 23, plaintiffs filed their own notice of appeal. We ordered the appeals consolidated.

5

## DISCUSSION

### SLAPP Law and the Standard of Review

Subdivision (b)(1) of Code of Civil Procedure section 425.16[3] provides that "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." Subdivision (e) of section 425.16 elaborates the four types of acts within the ambit of SLAPP.

We described the analysis under the anti-SLAPP law in *Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450, 463–464 (*Hecimovich*):

"A two-step process is used for determining whether an action is a SLAPP. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity, that is, by demonstrating that the facts underlying the plaintiff's complaint fit one of the categories spelled out in section 425.16, subdivision (e). If the court finds that such a showing has been made, it must then determine the second step, whether the plaintiff has demonstrated a probability of prevailing on the claim. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 (*Navellier*).)

" 'The Legislature enacted section 425.16 to prevent and deter "lawsuits [referred to as SLAPP's] brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." (§ 425.16, subd. (a).) Because these meritless lawsuits seek to deplete "the defendant's energy" and drain "his or her resources" [citation], the Legislature sought " 'to prevent SLAPPs by ending them early and without great cost to the SLAPP target' " [citation]. Section 425.16 therefore establishes a procedure where the trial court evaluates the merits of the lawsuit using a

---

[3] All statutory references are to the Code of Civil Procedure except where otherwise noted.

6

summary-judgment-like procedure at an early stage of the litigation.' (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 192.)

"Finally, and as subdivision (a) of section 425.16 expressly mandates, the section 'shall be construed broadly.'

"With these principles in mind, we turn to a review of the issues before us, a review that is de novo. (*Grewal v. Jammu* (2011) 191 Cal.App.4th 977, 988 (*Grewal*).)"

**Plaintiffs' Lawsuit Involves an Issue of Public Interest**

Facebook's anti-SLAPP motion was based on section 425.16, subdivision (e)(3). That subdivision provides that an act in furtherance of the right of free speech as described in section 425.16, subdivision (b)(1) includes "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest."

As the trial court aptly observed, "It cannot be disputed that Facebook's website and the Facebook pages at issue are 'public forums,' as they are accessible to anyone who consents to Facebook's Terms." This, of course, is consistent with the law establishing that "[w]eb sites accessible to the public . . . are 'public forums' for purposes of the anti-SLAPP statute." (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 41, fn. 4.)

So, the issue is whether plaintiffs' lawsuit is based on an "issue of public interest." We conclude it is.

We begin our analysis with more quotation from *Hecimovich*: "Like the SLAPP statute itself, the question whether something is an issue of public interest must be ' " 'construed broadly.' " ' (*Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 23; see *Rivera v. First DataBank, Inc.* (2010) 187 Cal.App.4th 709, 716 (*Rivera*).) An ' " 'issue of public interest' " ' is ' "*any issue in which the public is interested.*" ' (*Rivera*, at p. 716, quoting *Nygård, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1042.) A matter of ' " 'public interest should be something of concern to a substantial number of people. [Citation.] . . . [T]here should be some degree of closeness between the challenged statements and the asserted public interest [citation] . . . .' '[T]he focus of the speaker's

7

conduct should be the public interest . . . .' " [Citation.] Nevertheless, it may encompass activity between private people.' (*Rivera, supra,* 187 Cal.App.4th at p. 716.)

"We look for 'the *principal thrust* or *gravamen* of the plaintiff's cause of action.' (*Martinez v. Metabolife Internat., Inc.* (2003) 113 Cal.App.4th 181, 188.) We 'do not evaluate the first prong of the anti-SLAPP test solely through the lens of a plaintiff's cause of action.' (*Stewart v. Rolling Stone LLC* (2010) 181 Cal.App.4th 664, 679.) The 'critical consideration' is what the cause of action is '*based on.*' (*Navellier, supra,* 29 Cal.4th at p. 89.)" (*Hecimovich, supra,* 203 Cal.App.4th at pp. 464–465.)

As the trial court explained, the pages to which Knight objected discussed incidents involving contractors hired by plaintiffs, contractors who "fell asleep behind the wheel in two separate incidents, resulting in fatal collisions." And as the trial court concluded, "It is not a far stretch to say that such incidents, and the circumstances leading to them, are matters in which the public would be interested." Putting it slightly differently, the issue involved the danger of trucks on highways driven by sleep-deprived drivers. And as to this, Google searches for tired truck drivers reveals millions of results. It is an issue of tremendous concern.

Arguing in support of their appeal, plaintiffs make two arguments. The first is that their claim is based not on public statements, but rather, in plaintiffs' words, is "premised specifically on Facebook's statements made *privately* to Mr. Knight in August 2010 that Facebook would remove content where there was a threat to physical harm." Or, as plaintiffs put it at a later point, "the trial court erred by not focusing on 'the *specific nature of the speech* rather than the generalities that might be abstracted from it.' Here, the specific speech at issue was Facebook's own promises to [plaintiffs], not the speech of any third party." Plaintiffs' second argument is that the anti-SLAPP motion fails based on the "commercial speech" exception in section 425.17.

The trial court rejected both arguments. So do we.

Plaintiffs' first argument is, as the trial court concluded, inconsistent with the actual allegations in their complaint, the clear gravamen of which is Knight's objection to

8

the third-party content on the pages and Facebook's editorial decisions to not remove them. Thus, for example, the complaint contains these allegations:

"Facebook Refuses to Disable the Unauthorized Mikel Knight Page in Violation of Its Terms of Service";

"By refusing to disable the unauthorized Facebook pages, Facebook has engaged in conduct that has and will continue to cause significant physical harm to Knight and MDRST independent contractors . . . . But by refusing to disable the pages, Facebook acted with a willful and conscious disregard for the safety of Knight and MDRST independent contractors";

"By refusing to disable the unauthorized Facebook pages, Facebook has violated the Terms of Service."

Contrary to Knight's assertions, the complaint does not arise from "private" statements or promises made to Knight in Facebook's terms. Indeed, similar arguments made by other plaintiffs against Facebook have been rejected by district courts, in language directly applicable here: "while Facebook's Terms of Service 'place restrictions on users' behavior,' they 'do not create affirmative obligations' " on Facebook. (*Caraccioli v. Facebook, Inc.* (N.D.Cal. 2016) 167 F.Supp.3d 1056, 1064, quoting *Young v. Facebook, Inc.* (N.D.Cal. Oct. 25, 2010, No. 5:10-cv-03579-JF/PVT) 2010 WL 4269304 at *3; see also *Klayman v. Zuckerberg* (D.C. Cir. 2014) 753 F.3d 1354, 1359 [rejecting plaintiff's argument that Facebook's terms of service give rise to a duty to remove offensive content because "[t]he plain text of the [terms of service] thus disavows the legal relationship that [plaintiff] asserts"].)

Plaintiffs' brief states that "As a requirement to signing up for Facebook, Mr. Knight had to accept Facebook's Terms of Service. Among other things, the Terms of Service—along with certain 'supplemental terms' specifically incorporated by reference—prohibited harassing and violent speech against Facebook users. These supplemental terms also made an explicit promise to Knight: 'We remove credible threats of physical harm to individuals.' Facebook also stated that '[w]e want people to feel safe when using Facebook,' and agreed to 'remove content, disable accounts, and

9

work with law enforcement when we believe there is a genuine risk of physical harm or direct threats to public safety.' "[4]

As will be seen, there was much language in Facebook's terms and conditions providing for Facebook's discretion vis-à-vis content on its pages. But even if statements in Facebook's terms could be construed as obligating Facebook to remove the pages—which plaintiffs have not demonstrated—it would not alter the reality that the source of Knight's alleged injuries, the basis for his claim, is the content of the pages and Facebook's decision not to remove them, an act "in furtherance of the . . . right of petition or free speech." (§ 425.16, subd. (b)(1).) As the Ninth Circuit tersely put it, "[W]here . . . an action directly targets the way a content provider chooses to deliver, present, or publish news content on matters of public interest, that action is based on

---

[4] Plaintiffs did not provide the actual terms in existence when Knight joined Facebook, but specimen pages apparently in existence when their opposition was filed. As to the language distilled in plaintiffs' recitation, the actual language is as follows:

"Helping to Keep you Safe

"Direct Threats: How we help people who feel threatened by others on Facebook.

"We carefully review reports of threatening language to identify serious threats of harm to public and personal safety. We remove credible threats of physical harm to individuals. We also remove specific threats of theft, vandalism, or other financial harm.

"We may consider things like a person's physical location or public visibility in determining whether a threat is credible. We may assume credibility of any threats to people living in violent and unstable regions."

In the right-hand margin of this section were the following:

"Overview

"Direct Threats

"Self-Injury

"Dangerous Organizations

"Bullying and Harassment

"Attacks on Public Figures

"Criminal Activity

"Sexual Violence and Exploitation."

10

conduct in furtherance of free speech rights and must withstand scrutiny under California's anti-SLAPP statute." (*Greater Los Angeles Age. on Deafness v. Cable News* (9th Cir. 2014) 742 F.3d 414, 424–425; see *Hupp v. Freedom Communications, Inc.* (2013) 221 Cal.App.4th 398, 403 [plaintiff's claim that defendant publisher breached its user agreement with plaintiff by failing to remove comments made on publisher's website concerning plaintiff dismissed on anti-SLAPP motion]; see also *Wong v. Jing* (2010) 189 Cal.App.4th 1354, 1362, 1366.)

*Barnes v. Yahoo!, Inc.* (9th Cir. 2009) 570 F.3d 1096 (*Barnes*), the primary case on which plaintiffs rely, is distinguishable. There, a malicious ex-boyfriend created an unauthorized Yahoo! profile in the name of plaintiff, his ex-girlfriend. (*Id.* at p. 1098.) As the Ninth Circuit described, it was a "dangerous, cruel, and highly indecent use of the internet for the apparent purpose of revenge." (*Ibid.*) Plaintiff requested removal of the profile numerous times, without success. Finally, plaintiff received a call from Yahoo!'s director of communications, who made a specific promise to remove the imposter profile, representing that she would " 'personally walk the statements over to the division responsible for stopping unauthorized profiles and they would take care of it.' " (*Id.* at p. 1099.) The profile remained.

Plaintiff sued. The district court granted Yahoo!'s motion to dismiss. The Ninth Circuit affirmed in part and reversed in part, holding that plaintiff's negligent undertaking claim was barred by the CDA, but her promissory estoppel claim was not. (*Barnes, supra,* 570 F.3d at p. 1096.) Rather, the express promise by the director of communications to take specific action to "take care of it," and plaintiff's reasonable and detrimental reliance upon the promise, meant that plaintiff's claims sought to hold Yahoo! liable as a promissor rather than as a publisher or speaker of third-party content. As a result, the CDA did not apply to plaintiff's promissory estoppel claim.

Knight has no promissory estoppel claim—and *Barnes* no applicability here. Neither does section 425.17.

Section 425.17 provides that the SLAPP statute "does not apply to any cause of action brought against a person primarily engaged in the business of selling or leasing

goods or services . . . if both of the following conditions exist: [¶] (1) The statement or conduct consists of representations of fact about that person's . . . business operations, goods, or services, that is made for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, the person's goods or services, or the statement or conduct was made in the course of delivering the person's goods or services. [¶] (2) The intended audience is an actual or potential buyer or customer, or a person likely to repeat the statement to, or otherwise influence, an actual or potential buyer or customer . . . ." (§ 425.17, subd. (c)(1), (2).)

Attempting to invoke this exemption, Knight focuses not on the actual statements or conduct that are the basis of his right of publicity claims, but on portions of unrelated statements made in Facebook's terms and community standards. These, Knight argues, somehow form the basis of his right of publicity claim, and qualify as "representations of fact" made by Facebook for the purpose of selling more of its goods or services. The argument fails, for several reasons.

First, while Facebook sells advertising, it is not "primarily engaged in the business of selling or leasing goods or services." Knight has not alleged that it is. Nor could he, as Facebook offers a free service to its users.

Second, the relevant "statements" at issue in plaintiffs' complaint are not Facebook's terms and community standards. To the contrary—and as plaintiffs' complaint makes clear—Knight is not challenging any commercial statement by Facebook about its business operations. Rather, Knight's right of publicity claims and the derivative UCL claim arise from the speech of the third parties who created the pages and posted negative comments about Knight on them. Knight makes no attempt to show that these third-party statements constitute "commercial speech" by Facebook.

Third, even if Facebook's terms and community standards were the relevant statements or conduct at issue here, Knight has not identified any "representation of fact" that Facebook would remove any objectionable content. Indeed, the actual terms are to the contrary, providing in essence that Facebook has the discretion to remove content that violates Facebook policies. By way of illustration, the terms include that: "We can

12

remove any content or information you post on Facebook if we believe that it violates this Statement or our policies." The terms also make clear that Facebook is not responsible for "the content or information users transmit or share on Facebook," for "any offensive, inappropriate, obscene, unlawful or otherwise objectionable content or information you may encounter on Facebook," or for "the conduct, whether online or offline, of any user of Facebook." As Facebook sums it up, "We do our best to keep Facebook safe, but we cannot guarantee it."

Facebook's community standards are no more helpful to plaintiffs. The standards provide further guidance to users about what kind of content they can share on Facebook, and the types of discretionary actions Facebook may take with regard to content posted by others. And like the terms, the community standards provide that while Facebook may remove user content, it will not always remove content that a particular user might find objectionable. Examples include the following:

"[P]lease keep in mind that something that may be disagreeable or disturbing to you may not violate our Community Standards."

"Reporting something doesn't guarantee that it will be removed because it may not violate [Facebook's] policies."

"Our review decisions may occasionally change after receiving additional context about specific posts or after seeing new, violating content appearing on a Page or Facebook Profile."

"Not all disagreeable or disturbing content violates [Facebook's] Community Standards."

None of these statements are a "representation of fact" about Facebook's services made for the purpose of soliciting users. They are not within section 425.17. (See *Simpson Strong-Tie Co., Inc. v. Gore* (2010) 49 Cal.4th 12, 31 [promise in an advertisement not commercial speech]; *Navarro v. IHOP Properties, Inc.* (2005) 134 Cal.App.4th 834, 841 [allegedly false promises to process potential buyers of plaintiff's franchise rights without undue delay not a representation of fact].)

13

Knight's reliance on *Demetriades v. Yelp, Inc.* (2014) 228 Cal.App.4th 294 is misplaced. There, Yelp made a series of affirmative representations about the accuracy of its filtering software, including that it produced " 'the most trusted reviews.' " (*Id.* at pp. 300–301.) The trial court granted Yelp's anti-SLAPP motion. The Court of Appeal reversed, holding that the statements constituted commercial speech about the reliability of Yelp's review filter product, and were intended to reach third parties to induce them to patronize Yelp's website—and in turn induce businesses to purchase advertising on Yelp. (*Id.* at p. 310.) Moreover, the court concluded that Yelp's statements were factual, as opposed to mere puffery or opinion, because they were "specific and detailed statements intended to induce reliance, such as: the filter 'give[s]' consumers the 'most trusted' reviews, and Yelp's engineers (a word inspiring confidence) are working to provide the 'most unbiased and accurate' information available." (*Id*. at p. 311.) The setting here is a far cry.

Having concluded that the basis of the complaint is an issue of public interest under step one of the anti-SLAPP analysis, we turn to step two.

## Plaintiffs Have Failed to Demonstrate a Likelihood of Prevailing on the Merits

### The Law

As to step two, we confirmed the applicable law in *Grewal, supra,* 191 Cal.App.4th at p. 989, there in the context of one plaintiff:

"We decide the second step of the anti-SLAPP analysis on consideration of 'the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based.' (§ 425.16, subd. (b).) Looking at those affidavits, '[w]e do not weigh credibility, nor do we evaluate the weight of the evidence. Instead, we accept as true all evidence favorable to the plaintiff and assess the defendant's evidence only to determine if it defeats the plaintiff's submission as a matter of law.' (*Overstock.com, Inc. v. Gradient Analytics, Inc.* (2007) 151 Cal.App.4th 688, 699–700.) [¶] That is the setting in which we determine whether plaintiff has met the required showing, a showing that is 'not high.' (*Overstock.com, Inc. v. Gradient Analytics, Inc., supra,* 151 Cal.App.4th at

p. 699.)  In the words of the Supreme Court, plaintiff needs to show only a 'minimum level of legal sufficiency and triability.'  (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 438, fn. 5.)  In the words of other courts, plaintiff needs to show only a case of 'minimal merit.'  (*Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 675, quoting *Navellier v. Sletten*[*, supra,*] 29 Cal.4th [at p.] 95, fn. 11.)"

As we stated in *Hecimovich, supra,* 203 Cal.App.4th at p. 469:  "While plaintiff's burden may not be 'high,' he must demonstrate that his claim is legally sufficient. (*Navellier, supra,* 29 Cal.4th at p. 93.)  And he must show that it is supported by a sufficient prima facie showing, one made with 'competent and admissible evidence.' (*Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.* (2003) 106 Cal.App.4th 1219, 1236; see *Evans v. Unkow* (1995) 38 Cal.App.4th 1490, 1497.)"

In sum, to defeat an anti-SLAPP motion, plaintiffs " ' "must demonstrate that the *complaint is both legally sufficient* and supported by a sufficient prima facie showing of facts to sustain a favorable judgment." ' "  (*Premier Medical Managements Systems, Inc. v. California Ins. Guarantee Assn.* (2006) 136 Cal.App.4th 464, 476.)  Plaintiffs' demonstration does not measure up.

### The First, Second, and Third Causes of Action

As noted, the trial court granted the anti-SLAPP motion as to plaintiffs' first three causes of action, for breach of contract, negligent misrepresentation, and negligent interference, holding that the CDA barred these three claims.  We reach the same conclusion.

The CDA provides in pertinent part that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  (47 U.S.C. § 230(c)(1).)  An "interactive computer service" is "any information service, system . . . that provides or enables computer access by multiple users to a computer server."  (*Id.*, § 230(f)(2).)  And an "information content provider" is "any person or entity that is responsible, in whole or in

15

part, for the creation or development of information provided through the Internet or any other interactive computer service." (*Id.*, § 230(f)(3).)

As Congress itself put it, the reason for excluding interactive computer services from liability for republication was "to promote the continued development of the Internet and other interactive computer services . . . [and] to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation." (47 U.S.C. § 230(b)(1), (2); see *Batzel v. Smith* (9th Cir. 2003) 333 F.3d 1018, 1026–1029.) To that end, CDA immunity is to be construed broadly, "to protect websites not merely from ultimate liability, but from having to fight costly and protracted legal battles." (*Fair Housing Coun., San Fernando v. Roommates.com* (9th Cir. 2008) 521 F.3d 1157, 1175.)

As quoted above, the trial court held the CDA applied to Knight's first three claims because "(1) Facebook is an 'interactive computer service'; (2) Plaintiffs' claims treat Facebook as the 'publisher' or 'speaker' of the offending content; and (3) the offending content was 'provided by another information content provider.' " Knight disputes only the third conclusion. In Knight's words, his "Complaint specifically alleges that Facebook is liable because of its *own promises and representations* to [Knight], not because of anyone else's statements. And the CDA does not immunize website providers for failing to adhere to legally enforceable promises such as the ones at issue here." Or, as Knight goes on, he does "not allege that Facebook is vicariously liable for the statements of any third parties," but rather "that Facebook failed to adhere to its own legally enforceable promise."

This, of course, is the same argument Knight made in connection with step one, an argument we rejected. It has no more merit in step two. In evaluating whether a claim treats a provider as a publisher or speaker of user-generated content, "what matters is not the name of the cause of action"; instead, "what matters is whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." (*Barnes, supra,* 570 F.3d at pp. 1101–1102.) Put slightly differently, "courts must ask whether the duty that the plaintiff alleges the defendant

16

violated derives from the defendant's status or conduct as a 'publisher or speaker.'  If it does, section 230(c)(1) precludes liability."  (*Barnes, supra,* at p. 1102; see *Gentry v. eBay, Inc.* (2002) 99 Cal.App.4th 816, 832–833.)

Based on that principle, numerous courts have held the CDA bars claims based on a failure to remove content posted by others.  (*Hupp v. Freedom Communications, Inc., supra,* 221 Cal.App.4th at p. 405 [CDA barred breach of contract claim arising from newspaper's failure to remove comments on website]; *Doe II v. MySpace Inc.* (2009) 175 Cal.App.4th 561, 573 [CDA barred tort claims seeking to hold MySpace liable for "failing to exercise a publisher's traditional editorial functions, namely deciding whether to publish certain material or not"]; *Gentry v. eBay, Inc., supra,* 99 Cal.App.4th at p. 835 [CDA barred negligence claim based on eBay's failure to remove or alter allegedly fraudulent product descriptions].)  In fact, it was based on the CDA that the cases cited above ruled in favor of Facebook.  (See *Caraccioli v. Facebook, Inc., supra,* 167 F.Supp.3d at pp. 1064–1065 [dismissing plaintiff's claims for breach of contract and negligence for Facebook's decision not to remove content, as liability based on that sort of vicarious responsibility is what section 230 of the CDA seeks to avoid]; *Klayman v. Zuckerberg, supra,* 753 F.3d at p. 1357; *Sikhs for Justice "SFJ," Inc. v. Facebook, Inc.* (N.D.Cal. 2015) 144 F.Supp.3d 1088, 1094–1095 [CDA barred claim alleging that Facebook violated title II of the Civil Rights Act of 1964 (42 U.S.C. § 2000a) by blocking access to plaintiff's Facebook page in India because it sought "to hold Defendant liable for Defendant's decision 'whether to publish' third-party content"].)

### The Fourth, Fifth, and Sixth Causes of Action

As noted, the trial court denied the motion as to the remaining three causes of action, Knight's claims for (4) violation of Civil Code section 3344, (5) common law right of publicity, and (6) the derivative UCL claim on behalf of all plaintiffs.  The expressed reason was title 47 United States Code section 230, subdivision (e)(2), which states that "[n]othing in this section shall be construed to limit or expand any law pertaining to intellectual property."  In the court's view, "the right of publicity protects a form of intellectual property," and therefore the CDA does not apply to such claims.  The

17

court further held that Knight had shown a probability of prevailing on his right of publicity claims because he alleged that Facebook ran advertisements adjacent to the "unauthorized" pages created by third parties critiquing Knight and his business practices. We conclude this was error.

The fourth cause of action, for statutory right of publicity, is based on Civil Code section 3344, which provides in relevant part as follows: "Any person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner . . . for purposes of advertising or selling . . . without such person's prior consent, . . . shall be liable for any damages sustained by the person or persons injured as a result." (Civ. Code, § 3344, subd. (a).)

The fifth cause of action is for common law right of publicity. That claim has four elements: (1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury. (*Maxwell v. Dolezal* (2014) 231 Cal.App.4th 93, 97; *Stewart v. Rolling Stone LLC, supra,* 181 Cal.App.4th at p. 679.)

The sixth cause of action, the UCL claim, is, as plaintiffs' counsel acknowledged, a derivative claim based on the other two.

Civil Code section 3344 was intended to complement, not supplant, common law claims for right of publicity. (*Kirby v. Sega of America, Inc.* (2006) 144 Cal.App.4th 47, 55, citing *Comedy III Productions, Inc. v. Gary Saderup, Inc.* (2001) 25 Cal.4th 387, 391.) And "To prove the statutory remedy, a plaintiff must present evidence of 'all the elements of the common law cause of action' and must also prove 'a knowing use by the defendant as well as a direct connection between the alleged use and the commercial purpose.' " (*Orthopedic Systems, Inc. v. Schlein* (2011) 202 Cal.App.4th 529, 544.)

In light of the interrelatedness of the three clams, we analyze them together—and conclude plaintiffs cannot prevail.

Both Civil Code section 3344 and the common law require that Facebook "use" the plaintiff's identity. (*Montana v. San Jose Mercury News, Inc.* (1995) 34 Cal.App.4th 790, 793.) The evidence here demonstrated no such use.

18

We start with the observation that the complaint expressly alleges that the content at issue was created by third parties: "this unauthorized Facebook page was created by persons related to the injured and deceased independent contractors." Responding to this, Knight asserts that "the Complaint alleges that Facebook continued to place ads on all the unauthorized Facebook pages using Mikel Knight's name, and that Facebook refused to disable the unauthorized pages to continue generating revenue at the expense of using Knight's name or likeness." The complaint also alleges, however conclusionary, that "Facebook has used Knight's name and likeness for the purpose of advertising on the unauthorized Facebook pages."

To begin with, the allegations are unavailing. The law is that plaintiffs cannot rely on their pleading, even if verified, to demonstrate a probability of success on the merits. (*Hecimovich, supra,* 203 Cal.App.4th at p. 474; *Paiva v. Nichols* (2008) 168 Cal.App.4th 1007, 1017; *Roberts v. Los Angeles County Bar Assn.* (2003) 105 Cal.App.4th 604, 613–614.) Whatever the complaint may allege, it is not sufficient to defeat an anti-SLAPP motion. The *evidence* is what counts.

In any event, the conclusory assertions are belied by the actual complaint. Nowhere does Knight demonstrate that the advertisements appearing next to the pages used his name or likeness, or that any of the advertisements were created by, or advertised, Facebook. All he claims is that Facebook displayed advertisements next to pages created by third parties who were using Knight's name and likeness to critique his business practices—and their allegedly fatal consequences. While Knight claims that "Facebook continues to place ads on all the unauthorized Facebook pages," he necessarily concedes that his name and likeness appear not in the ads themselves, but in the content posted to Facebook by third parties.[5] This is insufficient.

*Perfect 10, Inc. v. Google, Inc.* (C.D.Cal., July 30, 2010, No. CV 04-9484 AHM (SHx)) 2010 WL 9479060, p. *13, affirmed (9th Cir. 2011) 653 F.3d 976, is instructive.

---

[5] This is confirmed by Knight's submission of excerpts of the unauthorized pages "Jason cross aka mikel knight" and "Prove yourself Jason Cross aka Mikel Knight," pages that show only unrelated, sponsored content adjacent to the pages.

In that case Google provided a service called Blogger, which allowed Blogger account holders to create their own blogs hosted on Google's servers. (*Perfect 10, Inc. v. Google, Inc.* (C.D.Cal., July 26, 2010, No. CV 04-9484 AHM (SHx)) 2010 WL 9479059, p. *2.) Perfect 10, which created and sold pictures of nude models, brought claims against Google for appropriation of the name and likeness of models featured in its photographs that had been uploaded by Blogger account holders. (*Id.* at p. *1; see *Perfect 10, Inc. v. Google, Inc., supra,* 2010 WL 9479060, at p. *2.)

Just as Knight contends here, Perfect 10 contended Google " 'materially contribut[ed] to violations of Perfect 10's assigned rights of publicity by providing the advertising' " on the Blogger pages, which " 'satisfie[d] the commercial purpose necessary to establish a violation of Section 3344(a) and the common law.' " (*Perfect 10 v. Google, Inc., supra,* 2010 WL 9479060, p. *13.) The district court disagreed, holding that Google's "contribut[ion]" to violations committed by its Blogger users was not actionable without a showing of use by Google itself: "P10 [(Perfect 10)] has not shown that Google is, in fact, inappropriately *using* the models' likenesses. Because both the statutory and common law versions of a right of publicity claim require that the defendant actually use the plaintiff's likeness . . . P10 has not established that it is likely to prevail on its right of publicity claim." (*Ibid.*, citing *Fleet v. CBS, Inc.* (1996) 50 Cal.App.4th 1911, 1918.)

The gravamen of Knight's complaint is that Facebook displayed unrelated ads from Facebook advertisers adjacent to the content that allegedly used Knight's name and likeness—content, Knight concedes, created by third-party users. He has not, and cannot, offer any evidence that Facebook used his name or likeness in any way. (*Montana v. San Jose Mercury News, Inc., supra,* 34 Cal.App.4th at p. 793, quoting *Eastwood v. Superior Court* (1983) 149 Cal.App.3d 409, 417 [requiring "defendant's use of the plaintiff's identity"]; see *Perfect 10, Inc. v. Google, Inc., supra,* 2010 WL 9479060 at p. *13 ["a plaintiff must show that *the defendant* appropriated the plaintiff's name or likeness for commercial purposes"].)

In sum, the evidence demonstrates that Facebook has not used Knight's identity, and any right of publicity claims fail for this reason alone. Likewise for failure to show appropriation.

As noted, one of the requisite elements of a common law right to publicity claim is that defendant appropriated plaintiff's name "to defendant's advantage, commercially or otherwise." Similarly, Civil Code section 3344, subdivision (a) requires that the name be used "for purposes of advertising or selling." Plaintiffs' showing falls short.

Plaintiffs assert that Civil Code section 3344's "commercial use" requirement does not need to "involve some form of advertising or endorsement." This is simply incorrect, as Civil Code section 3344, subdivision (a) explicitly provides for possible liability on "[a]ny person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner . . . for purposes of advertising . . . without such person's prior consent." The statute requires some "use" by the advertiser aimed at obtaining a commercial advantage for the advertiser. (See, e.g., *Eastwood v. Superior Court, supra,* 149 Cal.App.3d at p. 420 ["Turning to whether the Enquirer has commercially exploited Eastwood's name, photograph or likeness, we note that one of the primary purposes of advertising is to motivate a decision to purchase a particular product or service."].)

Knight has not even alleged—let alone shown—that any advertiser used his name or likeness. He thus cannot establish that anyone, let alone Facebook, obtained an advantage through use of his identity. Indeed, the evidence Knight submitted below demonstrated either that no advertisements appeared alongside the pages at issue, or that the advertisements that did appear adjacent to the content posted by third parties made no use of his name or likeness. At most, Knight has shown that Facebook allowed unrelated third-party advertisements to run adjacent to pages containing users' comments about Knight and his business practices. This is insufficient.

*Newcombe v. Adolph Coors Co.* (9th Cir. 1998) 157 F.3d 686 is persuasive. Plaintiff Newcombe, a recovering alcoholic, was an all-star pitcher whose major league career was cut short due to his service in the military and a personal battle with alcohol. Killian's Irish Red Beer, owned by Coors Brewing Co., published an advertisement in

21

*Sports Illustrated* that featured a drawing of an old-time baseball game. The drawing was on the left half of the full-page advertisement; the right half was filled with text and a picture of a glass of beer. The baseball scene focused on a pitcher in a windup position, and the background included a single infielder and an old-fashioned outfield fence. The players' uniforms did not depict an actual team, and the background did not depict an actual stadium. However, Newcombe, along with family, friends and former teammates, immediately recognized the pitcher featured in the advertisement as Newcombe in his playing days. (*Id.* at p. 689.)

Newcombe filed suit in California state court against several defendants, including Coors and Time, the publisher of *Sports Illustrated*, alleging that his identity had been misappropriated in violation of California statutory and common law, and that the advertisement was defamatory. Defendants removed the case to federal court, which thereafter granted defendants' motion for summary judgment. The Ninth Circuit reversed in part, finding factual issues as to defendant Coors. But as to defendant Time, the Ninth Circuit affirmed. Applying California law, the court held that "the use of Newcombe's likeness could not be said to have directly benefited Time, Inc., the publisher of *Sports Illustrated*, because the benefit they received—payment for the advertising space—was unrelated to the contents of the advertisement." (*Newcombe, supra,* 157 F.3d at p. 693.)

Here, any "benefit" to Facebook from the use of Knight's name and likeness is even more attenuated. The advertisement in *Newcombe* actually depicted Newcombe, but Time was still not liable for the sale of advertising space to a third party that used Newcombe's identity in its ads. The advertisements here did not depict Knight, using neither his name nor identity. They were, as in *Newcombe*, "unrelated to the contents" of those pages.

*Stewart v. Rolling Stone LLC, supra,* 181 Cal.App.4th 664, is also instructive. Plaintiffs there were indie rock musicians whose band names were included with the names of over 100 other bands in an editorial feature that appeared in the magazine. The feature consisted primarily of a four-page foldout described by the parties as a butterfly gatefold, which foldout contained a cigarette ad appearing as a two-page spread. The

gravamen of the complaint was that defendants used the band names of plaintiffs (and other members of the class) knowingly and deliberately for the commercial purpose of advertising cigarettes without their prior authorization. The trial court denied defendants' special motion to strike. Our colleagues in Division One reversed, concluding "there is no legal precedent for converting noncommercial speech into commercial speech merely based on its proximity to the latter." (*Id.* at p. 689.)

Here, as in *Newcombe* and *Stewart*, there was no commercial benefit to Facebook from the use of Knight's likeness. Simply, the appearance of advertisements next to a third party's use of Knight's identity is insufficient to demonstrate a commercial use by Facebook. It has not benefited Facebook in any actionable way.

As indicated, to defeat an anti-SLAPP motion, Knight " ' "must demonstrate that the *complaint is both legally sufficient* and supported by a sufficient prima facie showing of facts to sustain a favorable judgment." ' " (*Premier Medical Management Systems, Inc. v. California Ins. Guarantee Assn., supra,* 136 Cal.App.4th at p. 476.) This, he has failed to do, and the fourth, fifth, and sixth causes of action must be stricken.[6]

In light of the above, we need not address Facebook's argument that the fourth, fifth, and sixth causes of action fail based on the public interest defense based on the First Amendment. (See Civ. Code, § 3344, subd. (d) ["use of a name, voice, signature, photograph, or likeness in connection with any news, public affairs, or sports broadcast or account, or any political campaign, shall not constitute a use for which consent is required"]; *Dora v. Frontline Video, Inc.* (1993) 15 Cal.App.4th 536, 545 [scope of "public affairs" and the "public interest" is broad and "include[s] things that would not necessarily be considered news"].) Nor the argument that these claims are barred by the immunity created by the CDA.

---

[6] As to the sixth cause of action, the UCL claim, plaintiffs assert that Facebook waived its argument as to this claim for failure to address it specifically. We disagree, especially as the trial court concluded—and Knight admits—that the UCL claim was derivative of Knight's right of publicity claims which "serve as the predicate unlawful business practices under the UCL." In any event, Facebook mentioned the issue in its opening brief.

23

## DISPOSITION

The May 31, 2016 order is affirmed in part and reversed in part, and the matter is remanded to the trial court with instructions to (1) enter an order granting the anti-SLAPP motion in its entirety and striking the complaint, and (2) hold a hearing, following further briefing, to award Facebook the attorney fees to which it is entitled under section 425.16. Facebook shall recover its costs on appeal.

_____
Richman, Acting P.J.

We concur:

_____
Stewart, J.

_____
Miller, J.

A148623 & A149140; *Cross et al. v. Facebook*

Trial Court:   San Mateo County Superior Court

Trial Judge:   Hon. Donald J. Ayoob

Counsel:

Punzalan Law, Mark L. Punzalan; Cole Law Group, Todd G. Cole for Plaintiffs and Appellants.

Perkins Coie, Michael B. Garfinkel, Eric David Miller, Julie Erin Schwartz, Lauren B. Cohen; Durie Tangri, Sonal Naresh Mehta for Defendant and Appellant.

Public Citizen Litigation Group, Paul Alan Levy; Zeitgeist Law and Marcia Clare Hofmann for Public Citizen, Inc., as Amicus Curiae on behalf of Defendant and Appellant Facebook, Inc.

Electronic Frontier Foundation, Daniel Kelly Nazer for The Electronic Frontier Foundation, Engine, Eric Goldman, Github, Inc., Medium, The Organization for Transformative Works, Rebecca Tushnet, Snap, Inc., Wikimedia Foundation, and Yelp, Inc., as Amici Curiae on behalf of Defendant and Appellant Facebook, Inc.

Wilmer Cutler Pickering Hale and Dorr, Ari Holzblatt, Patrick J. Carome, Emily J. Barnet and Mark Donnell Flanagan for Airbnb, Inc., IAC/InterActiveCorp., Google, Inc., LinkedIn Corp., Reddit, Inc., and Twitter, Inc., as Amici Curiae on behalf of Defendant and Appellant Facebook, Inc.

Randazza Legal Group, Marc John Randazza and Alex James Shepard for Consumer Opinion LLC and AVVO, Inc., as Amici Curiae on behalf of Defendant and Appellant Facebook, Inc.